UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ARIANE PEREZ,

       Plaintiff,

v.                                             Case No. 8:20-cv-769-SPF

UNITED STATES OF AMERICA,

       Defendant.

_____/

## **ORDER**

Plaintiff Ariane Perez's ("Perez") Federal Torts Claim Act, 28 U.S.C. § 2761, *et. seq.* ("FTCA") action against Defendant United States of America arises from a motor vehicle accident that occurred on August 13, 2018.  Perez alleges the United States' employee, Joel Handlon ("Handlon"), negligently operated or maintained a motor vehicle such that it rear-ended the vehicle Perez was driving.  Perez further alleges that the force of the impact caused a chain reaction whereby her vehicle struck the one in front of it, which, in turn, struck the vehicle in front of it.  Perez contends she suffered permanent injuries to her cervical and lumbar spine and is entitled to economic and non-economic damages totaling $2,004,159.52.[1]

The United States contests Perez's claims, including the type of impact involved, whether the accident caused any injuries to Perez, and the extent of any damages.  The United States asserts that the evidence shows that Perez sustained only non-permanent lumbar

---

[1] Perez, however, concedes that her damages are capped at the amount specified in her amended administrative claim of $1,000,000.00.  (Doc. 77 at 17).

symptoms temporally related to the accident and should be awarded damages totaling $8,070.18.

The Court conducted a three-day bench trial spanning August 24-26, 2021 (Docs. 56, 63, 68).  Perez testified on her own behalf and elicited testimony from treating physicians Charles Davis, M.D. and Jay Parekh, D.O.  and lifecare planning expert Steven Barna, M.D.  The United States called Handlon to testify as well as expert witnesses Geoffrey Cronen, M.D. and Marc Kaye, M.D.  Additionally, the Court reviewed evidence introduced by the parties, including Perez's medical records and photographs of the damage to the parties' vehicles.  After the close of the evidence, the parties filed Proposed Findings of Fact and Conclusions of Law (Docs. 76, 77).  Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### I.    Stipulated Facts

Prior to trial, the parties agreed to the following facts for which no evidence was required:

1. Time, Date, and Place of occurrence.

2. At the time of the accident Joel Handlon was an employee of OPM, engaged in the course and scope of his employment and operating the vehicle with permission of the OPM, which owned the vehicle.

3. Plaintiff timely filed her initial administrative claim with OPM.

4. Plaintiff did not own the vehicle that she was operating at the time of the incident.

(Doc. 45).

## II.    August 13, 2018 Accident

On August 13, 2018, Handlon was driving on State Road 54 in Wesley Chapel, Florida, when he rear-ended a vehicle driven by Perez.  As a result of this collision, Perez's car collided with the vehicle in front of it, which hit the vehicle in front of it.  Perez, who was wearing her seatbelt, did not report any injuries at the scene of the accident.  Perez's vehicle sustained minimal damage to the front and rear bumpers, and she was able to drive the vehicle away from the accident scene.  At trial, Perez submitted an estimate from Jim Browne Collision Center estimating the cost to repair the front and rear bumpers to be $1,417.38. *See* Plaintiff's Exhibit 11- 001-004.  Perez's did not seek medical care at the time of the accident.

## III.    Post-Accident Medical Care

While Perez claims she experienced lower back and neck pain immediately following the accident, the medical evidence reflects that on August 16, 2018, three days after the accident, she sought medical care at Florida Medical Clinic for low back pain only.  Jennifer Wetherington, M.D.'s note described the following History of Present Illness:

> [Thirty-five-year-old female complaining of] low back pain after [motor vehicle accident] 3 days ago.  She was the restrained driver of a vehicle that was hit from behind as she slowed for an upcoming stop sign, then hit the car in front of her.  No air bags deployed, no head trauma or [loss of consciousness].  **No pain at the time of the incident.  Soreness started the next day and has increased/ persisted, in low back only**, bilateral, no radiation of pain, no numbness, tingling or weakness, no loss of bladder or bowel control.  Pain with prolonged sitting and when laying in bed at night, hard to get comfortable.  No [history] of back problems.  Taking only Tylenol.

(Plaintiff's Ex. 1, p. 001) (emphasis added).  Examination revealed tenderness on palpation to Perez's lumbarsacral spine as well as paravertebral muscle tenderness (*Id.*).   Dr. Wetherington prescribed Naproxen, Cyclobenzapine, rest, heat/ice, activity as tolerated; and instructed Perez to return if symptoms persist or worsen (Plaintiff's Ex. 1, p. 002).

Perez did not return to Dr. Wetherington.  Instead, five days later, on August 21, 2018, she began treatment with chiropractor William Abrahams, D.C. at Synergy Health & Wellness Center.  On the Injury Questionnaire intake form, Perez described her condition as "lower back pain" and checked off the symptoms "Low Back Pain," "Tired/Fatigued," and "Difficulty Sleeping" (Plaintiff's Ex. 3, p. 003).  She did not check off "Neck Pain," despite it being an option on the form (*Id.*).  Nevertheless, the chiropractor added complaint #2: "acute posterior cervical (neck) complaint due to the accident on 8/13/2018" and indicated Perez rated her pain as a 2 out of 10 (Plaintiff's Ex. 3, p.019).

Findings from an August 22, 2018 cervical x-ray included "straightening of the normal curvature of the cervical spine with grade 1 retrolisthesis of C4/C5; on extension is grade 1 retrolisthesis of C3/C4; these findings can be seen with ligamentous injury, muscle spasm or sprain." (Plaintiff's Ex. 2, p. 003).  Findings from an August 22, 2018 lumbar x-ray included "vertebral body heights within normal limits … some narrowing at L5-S1 … 5 degree rightward curvature of the mid lumbar spine with the apex at L2-L3" (Plaintiff's Ex. 3, p. 014).

Return visits through September 26, 2018 reflect continued complaints of lumbar, lower thoracic and cervical discomfort Perez characterized as "aching and dull" (Plaintiff's Ex. 3, p. 025-030).  Examinations revealed "entire lumbar and cervical moderately reduced [range of motion] with pain" and the chiropractor described Perez as "improving because she is reporting less discomfort and is showing improved function" (Plaintiff's Ex. 3, p. 025-044).  A September 20, 2018 cervical MRI found straightening of the normal curvature of the cervical spine; central disc bulges at C3-C4, C5-C6 and C7-T1; and a C4-C5 broad central disc herniation (Plaintiff's Ex. 3, p. 001).  Chiropractic notes from September 28 through

4

November 7, 2018 add that "[s]he has been having more tingle in the left hand at times and pain into the shoulder." (Plaintiff's Ex. 3, p. 045-064).

On October 18, 2018, Perez visited Dr. Jay Parekh, D.O., an interventional spine and joint specialist, for complaints of neck and back pain. She described her neck pain as aching and throbbing, worse when looking down or side-to-side, with numbness in the left underarm and fingers of the left hand. She described her low back pain as aching and worse with prolonged sitting, standing, and walking, causing her to constantly shift positions to alleviate her pain (Plaintiff's Ex. 4, p. 021-025). Dr. Parekh's assessed acute pain due to trauma; cervical disc herniation; cervical facet joint syndrome; cervicogenic headache; discogenic cervical pain; cervical radicular pain; lumbar facet joint pain; lumbar discogenic pain syndrome; and insomnia (*Id.*).

On November 10, 2018, in an effort to treat Perez's cervical facet joint syndrome, Dr. Parekh administered cervical medial branch blocks at C4, C5 and C6 (Plaintiff's Ex. 4, p. 019-020). Unfortunately, when Perez reported only minimal relief from the cervical medial branch blocks, Dr. Parekh opined that "it is probable [her] pain is originating from the cervical discs causing either mechanical compression, chemical irritation, and/or inflammation to the exiting nerve roots" and scheduled a cervical epidural steroid injection (Plaintiff's Ex. 4, p. 018).

After a month-long break, Perez returned to her chiropractor on December 12, 2018, reporting lumbar, lower thoracic, and cervical discomfort. On that date, the chiropractor described Perez's range of motion as "mildly" reduced with pain and her status as "improving" with "less discomfort" and "improved function." He noted she received a "shot

in the neck and it didn't help" and is "going back for a steroid shot to help reduce the pain" (Plaintiff's Ex. 3, p. 065-066).

Perez returned to Dr. Parekh on December 15, 2018 for a cervical epidural steroid injection due to her continued neck and arm pain (Plaintiff's Ex. 4, p. 014-015). Two weeks later, on December 26, 2018, Perez returned to her chiropractor who again described her range of motion as mildly reduced with pain; and her status as "improving because she is reporting less discomfort and is showing improved function" (Plaintiff's Ex. 3, p. 067-068). Perez returned to Dr. Parekh on January 12, 2019, reporting neck pain that was "not as severe as it was prior to the [cervical steroid injection]," but "increasing lower back pain" (Plaintiff's Ex. 4-012, p. 013). At trial, Dr. Parekh testified that Perez's neck pain improved as a result of the December 15, 2018 epidural steroid injection (Doc. 73 at p.135, lines 13-14). Specifically, Dr. Parekh testified that at a January 12, 2019 follow-up appointment, Perez reported that the injection helped her; thus, Dr. Parekh and Perez's "attention kind of focused to her lower back at that point" (Doc. 73 at p.135, lines 17-18). Dr. Parekh testified that in January 2019 he advised Perez to "come back and see me as needed [for neck pain] (Doc. 73 at p.144, lines 24-25), and that the "same thing" was the case with her lower back, — "it was up to her to call back" (Doc. 73 at p.145, lines 14-15). Perez did not return to Dr. Parekh again until May 12, 2020— approximately 16 months after Dr. Parekh advised her to return as needed (Doc. 73 at p.136, line 20).

On January 16, 2019, Perez's chiropractor opined she had reached maximum medical improvement ("MMI") because she "show[ed] no change in level of discomfort" and recommended that she return twice a month to maintain current improvement (Plaintiff's Ex. 3, p. 069-070). The chiropractor advised Perez to "follow up with the medical doctor if she

6

has any exacerbation and decides to have the recommended procedure" (Plaintiff's Ex. 3, p. 069).

After reaching MMI, Perez returned for follow-up chiropractic care on February 1, 15, March 1, 8, 11, and 18, 2019, reporting "unchanged" lumbar and cervical discomfort with pain levels of 3 out of 10 and 4 out of 10, respectively; examination revealed mildly reduced range of motion with pain (Plaintiff's Ex. 3, p. 071-084).   Then, following a six-week hiatus in treatment, Perez returned to the chiropractor on April 30, 2019, again reporting "unchanged" lumbar and cervical discomfort, pain levels of 3 out of 10 and 4 out of 10, respectively, and examination showed mildly reduced range of motion with pain (Plaintiff's Ex. 3, p. 085-086).

Aside from a solitary chiropractic visit on September 6, 2019, Perez did not seek any medical care related to her neck or back between April 30, 2019 and October 2, 2019.   The September 6, 2019 chiropractic note indicates that Perez reported being "unable to come in for treatment due to her job and school schedule" (Plaintiff's Ex. 3, p. 087-088).   Treatment records for general medical care during this time frame fail to include any evidence of neck and back injuries or symptoms.   In particular, at a June 27, 2019 Advent Health appointment, Perez complained of headaches, fatigue, and swelling in her feet and ankles.   Perez reported that she felt more drained lately going to nursing school and working, and that she "just doesn't feel like herself" (Defendant's Ex. 2 at 11 AdventHealth PC-0011).   Records from this date indicate "no muscle aches or weakness," "neck, supple," motor strength and tone "normal," and joints, bones, and "normal movement of all extremities" with no edema (Defendant's Ex. 2 at 12, AdventHealth PC-0012).   Similarly, at an August 5, 2019 annual examination, Perez complained of fatigue and weight gain, but reported no muscle aches, no

muscle weakness, no muscle cramps, no weakness, no numbness, no dizziness, and no headaches. The nurse practitioner described her neck as "supple, trachea midline, and no masses" (Defendant's Ex. 1).

When asked at trial about this hiatus in care, Perez stated "a lot of it had to do at the time with what was going on in my life." (Doc. 73 at p.228, lines 23-24). The medical records and Perez's testimony reflect that after the accident Perez maintained her "rigorous nursing school schedule and … was super determined to finish" (Doc. 73 at p.228, lines 23-25). As the "breadwinner in [her] home" Perez juggled her LPN job and her nursing courses (Doc. 73 at p.229, lines 2-3) and began a new full-time nursing job with DaVita Medical Florida, Inc. on April 15, 2019 (Defendant's Ex. 18, OPTUM-0025).

On October 2, 2019, shortly before completing her RN degree, Perez consulted with orthopedist Charles Davis, M.D. about her low back and cervical pain (Plaintiff's Ex. 5, p. 001). After examining Perez, Dr. Davis assessed only multilevel cervical disc herniations causing/contributing to patient's axial neck pain and left arm radiculopathy; and left cubital tunnel (Plaintiff's Ex. 5, p. 001-003). At trial, Dr. Davis testified that when he listened to the symptoms Perez described on October 2, 2019 and looked at the cervical MRI taken one month after the accident, he "didn't really feel what he saw on the MRI would really cause the symptoms" and ordered an updated MRI (Doc. 72 at p. 49, lines 17-19). Dr. Davis opined that Perez had failed conservative treatment and was now a surgical candidate (*Id.*). According to the report signed by radiologist Brian Butler, M.D., the October 8, 2019 cervical MRI revealed:

> 1. The broad-based disc herniation compressing the ventral aspect of the cord at C4-5 is stable. There is no cord edema at this time. The degree of canal narrowing is stable. There is persistent bilateral neural foraminal compromise.

2. The broad-based disc bulging at C3-4 is stable. There is stable bilateral neural foraminal compromise, more prominent on the left.

3. There is stable broad-based disc bulging at C5-6. It is most prominent centrally where there may be a small focal disc protrusion. There is left-sided neural foraminal compromise.

4. There is stable disc bulging at C6-7. There is mild left-sided neural foraminal narrowing.

5. There is stable disc bulging at C7-T1.

6. There is stable straightening of the normal lordosis of the cervical spine. Muscle spasm could be contributing to this.

(Plaintiff's Ex. 5, p. 016).[2] According to Dr. Davis, the updated MRI showed "a progression and then the symptomatology kind of made sense to me what was going on," "made a bit more sense," and explained why she was reporting transient radiculopathy (Doc. 72 at p.49, lines 10-11). Based on Perez's updated MRI and her symptoms, Dr. Davis opined that "C4/5 and C5/6 total disc replacement will significantly improve the patient's condition" (Plaintiff's Ex. 5, p. 024).

On December 2, 2019, underwent a complete radical discectomy with bilateral foraminotomy at C4-5 and C5-6 and insertion of a total disc replacement at both C4-5 and C5-6 (Plaintiff's Ex. 5, p. 028). At trial, Dr. Davis testified that during surgery he noted that the disc he removed "was more of an acute disc. It was fairly well hydrated" (Doc 72 at p.62, lines 12-13). According to Dr. Davis, "when a disc gets terribly degenerated it gets desiccated or dried out and kind of crackly … her's was not like that" (Doc. 72 at p.62, lines 15-17). Following surgery, on December 18, 2019, Dr. Davis opined that Perez was "doing very well" and "can be released for light duty work" (Plaintiff's Ex. 5, p. 031). Perez returned to Dr. Davis again on January 22, 2020, reporting only minimal neck pain with no left arm

[2] Dr. Butler's report indicates he reached this impression after comparing the October 8, 2019 cervical MRI to Perez's previous cervical MRI from September 20, 2018 (Plaintiff's Ex. 2, p. 001).

symptoms since the surgery.  She described episodic lower back pain that is localized, worse with bending and lifting, and not changed since her previous visit (Plaintiff's Ex. 5, p. 035-036).

Post-operatively, Perez participated in routine physical therapy from March 5, 2020 through May 12, 2020, and the physical therapy records reveal Perez rated her cervical pain as 1 out of 10 and reported that her radicular symptoms had been eliminated (Plaintiff's Ex. 7, p. 023).  After reviewing Perez's post-surgical x-ray on April 29, 2020, Dr. Davis opined she was "doing exceptionally well," and can "do her normal activity at work" (Plaintiff's Ex. 5, p. 041).

Although Perez's cervical complaints subsided following her surgery, her lumbar complaints increased.  At a February 26, 2020 follow-up visit to Dr. Davis, Perez reported "lower back pain seems to be getting worse" (Plaintiff's Ex. 5, p. 037-039).  And, on May 12, 2020, after Dr. Davis released Perez to return to normal work activity, Perez finally returned to Dr. Parekh for the first time since January 2019.  Perez reported aching and throbbing low back pain, worse with prolonged sitting, standing, and walking or when leaning backward (Plaintiff's Ex 4-010).  Unfortunately, by the next time Perez returned to Dr. Parekh on June 2, 2020, her low back symptoms progressed to include radiation down her left hip (Plaintiff's Ex. 4, p. 008).  Dr. Parekh ordered an updated MRI of her lumbar spine and instructed her to avoid lifting anything greater than 10-15 lbs. and to avoid all high impact activities (*Id.*).  Upon review of the lumbar MRI, Dr. Parekh opined Perez had multiple disc herniations present on the lumbar spine and described pain consistent with lumbar discogenic and facetogenic pain (Plaintiff's Ex. 4, p. 008-009).  In July 2020, when a lumbar epidural steroid injection on July 1, 2020 offered only minimal relief, and Perez continued to report low back

pain, Dr. Parekh recommended decompression, annuloplasty, and nucleoplasty on the L4-5 and L5-S1 lumbar discs (Plaintiff's Ex. 4, p. 004-005).

Despite his recommendation that Perez undergo lumber surgery, Perez waited an entire year before returning to see Dr. Parekh on August 16, 2021. At that visit, Perez reported that her symptoms had worsened. She described "significant lower back pain [that] goes down the right leg."[3] Nonetheless, Dr. Parekh's records reveal that Perez advised she "has been having difficulty scheduling her surgery due to family issues and work" (Plaintiff's Ex. 4, p. 001-002). At trial, Perez testified that she considered undergoing the recommended lumbar surgery but did not want to jeopardize her new job. She testified that she plans to undergo the surgery once she has accrued sufficient paid time off (PTO) to take time off (Doc. 73 at p.230, lines 4-13).

## IV. Non-Treating Experts

### A. Dr. Steven Barna

Dr. Barna, a lifecare planner, testified that he was retained to project Perez's future medical care related to the August 13, 2018 accident (Doc. 72 at p.121, lines 17-20). Dr. Barna reviewed records from Tampa Bay Orthopedic Surgery Group, Rose Radiology, Akumin, MI Associates, OPPT, Universal Spine & Joint Specialists, Synergy Health & Wellness, Dr. Wetherington, FH Community Care, the traffic accident report, the Jim Browne Collision Center report, and photographs of the damage to Perez's vehicle (Doc. 72 at p.130, lines 23-25- p.131, lines 1-3) and met with Perez via a telehealth visit. At trial, Dr.

---

[3] In August 2020, Perez also returned to Dr. Davis for the first time since April 2020, reporting minimal neck discomfort but constant lower back pain radiating to her bilateral hips and down her left leg (Plaintiff's Ex. 5, p. 042-043). Dr. Davis testified that after the cervical surgery, Perez "asked me about her lower back which I hadn't seen before then …" (Doc. 72 at p.66, lines 3-4).

Barna opined that Perez "sustained serious and permanent injuries to her cervical spine and lumbar spine as a result of the traumatic event that occurred on August 13, 2018" (Doc. 72 at p.133, lines 1-3).   Dr. Barna testified that he recommends the following future medical care during Perez's 48-year life expectancy: physical therapy, $105,600; diagnostic x-rays, $4,490; additional cervical surgery, $120,762; lumbar discectomy, $118,704 (Doc. 72 at pp.142-150).

### B. Dr. Jeffrey Cronen

Dr. Cronen, who testified as an expert for the United States, reviewed Perez's radiological studies.   Dr. Cronen testified that Perez's August 22, 2018 lumbar x-ray showed diminished disc height at bottom segments at L5-S1. Dr. Cronen testified that Perez's May 20, 2020 MRI showed disc desiccation and broad base bulging at L5-S1; no evidence of herniation at any segment; facet arthrosis so some degeneration of her facet joints and also dessication at L4-5 (Doc. 73 at p.33, lines 13-18).   In sum, Dr. Cronen opined that the lumbar studies showed no evidence of acute findings. Rather, Dr. Cronen opined that the findings were degenerative in nature as there was no evidence that Perez's injury had progressed (Doc. 73 at p.34, lines 10-18).

Similarly, Dr. Cronen testified that Perez's August 22, 2018 cervical spine x-ray showed an osteophyte at C3-4 and C4-5, a finding consistent with disc degeneration "that had been present long enough to create disc osteophyte complex" (Doc. 73 at p.20, lines 21-23). Dr. Cronen testified that Perez's September 20, 2018 cervical MRI showed "age-appropriate degeneration" with no acute findings, consistent with the August 22, 2018 cervical spine x-ray (Doc. 73 at p.22, lines 15-18).   In comparing Perez's September 20, 2018 MRI with her October 8, 2019 MRI, Dr. Cronen found the two the same, meaning she had stable degenerative findings (Doc. 73 at p.29, line 11).   Dr. Cronen explained: "if a traumatic finding

occurs and the study is done in close proximity to it, you would expect those findings to evolve over time.  So generally you wouldn't expect them to remain stable if there had been an injury that occurred within some short period of time prior to the initial MRI being done." (Doc. 73 at p.29, lines 16-21).

### C. Dr. Marc Kaye

The United States' other expert, Dr. Kaye, who specializes in diagnostic radiology and vascular interventional radiology, opined that the x-rays taken a little over a week after the accident showed no evidence of acute trauma or injury but showed evidence of chronic disc degeneration (Doc. 73 at pp.82-84).  Dr. Kaye testified that Perez's May 20, 2020 lumbar MRI, taken nearly two years after the accident, showed evidence of chronic disc degeneration in the lower lumbar spine (Doc. 73 at pp.84-86).  In particular, Dr. Kaye testified that the MRI showed normal spinal fluid at L1-L2 and L2-L3 but darker/brighter signal at L4-L5 and L5-S1 indicating disc degeneration and an annular fissure (where the disc is drying up and starts to crack and get fissures indicative of chronic disc degeneration), indicative of chronic disc degeneration and not indicative of acute trauma (Doc. 73 at p.84, lines 17-25-p.85, lines 1-12).  Dr. Kaye also explained that Perez's lumbar spine showed very minimal disc bulging at L4-5, L5-S1, retrolisthesis (displacement) backward at S1, and that the disc was sticking out a bit at L5 due to facet arthropathy which happens when the facets (the joints in the back of the spine) degenerate and narrow causing the vertebral body to back out or move back.  Dr. Kaye testified that arthropathy is evidence of chronic degenerative changes due to excessive stress on the spine (Doc. 73 at p.85, lines 15-25-p.86, lines 1-5).

Dr. Kaye testified that Perez's August 22, 2018 cervical spine x-ray showed "some evidence of chronic degenerative disease within the cervical spine," and that the September

20, 2018 MRI from approximately a month after the accident showed "no evidence of acute trauma" (Doc. 73 at p.62, line 7).  Based on this evidence, Dr. Kaye opined that Perez had chronic degenerative changes superimposed upon a congenitally narrow spinal canal which resulted in significant spinal stenosis at several levels.  (Doc. 73 at p.62, lines 22-25).  Similar to Dr. Cronen, Dr. Kaye opined that Perez's October 8, 2019 MRI showed "no significant change" since the September 20, 2018 MRI indicative of "a chronic process that would probably remain stable over many years" (Doc. 73 at p.79, lines 1, 9-10).  Thus, Dr. Kaye opined that within a reasonable degree of medical probability Perez's cervical disc degeneration, disc bulging, osteophytes, and spinal stenosis were not caused by the motor vehicle accident on August 13, 2018.  (Doc. 73 at p.81, lines 1-5).

## V.     Post-Accident Quality of Life

At the time of the accident, Perez was employed as a Licensed Practical Nurse ("LPN") for Gale Nursing Staff Agency working mainly in long-term care facilities (Doc. 73 at p.181, lines 21-15- p.182, lines 1-9; p.214, lines 2-17).  Perez's employment records describe the physical effort for the LPN position entails occasional sedentary work (continuous sitting); occasional light work (standing, lifting more than 15 pounds); constant moderate work (lifting, moving, loading 15-30 pounds, prolonged use of small hand tools, climbing ladders); occasional moderate to heavy work (lifting, moving, loading 31-50 pounds); and occasional heavy to hard work (above average strength and stamina lifting more than 51 pounds, constant shoveling) (Defendant's Ex. 17, GALE-0023).  Despite this job description, Perez testified that in "the setting that I worked the patients walk and do everything by themselves" (Doc. 73 at p.184, lines 15-16).  Perez also noted that she worked nights when "people are

asleep already" (Doc. 73, p.215, lines 4-5).  In addition to working as an LPN, at the time of the accident Perez was busy pursing her registered nursing (RN) degree (*Id*.).

The evidence consistently establishes that Perez regularly attended her LPN job, then switched to full-time work while enrolled in RN courses, ultimately graduating in November 2019 and becoming employed as an RN.  At trial, Perez testified that after the accident she was employed as an LPN for an agency, a job which allowed her the flexibility such that "if ever there was a day that I had that much pain, I wouldn't [take a shift]" (Doc. 73 at p.237, lines 17-18).  She testified that she declined to take "maybe one or two shifts" in the months of August through October 2018 because of pain in her neck or back (Doc. 73 at p.239, lines 3-5).  She also testified that in 2019 she started working full-time and did not ever need to call off work due to neck or back pain (Doc. 73 at p.239, lines 6-8).  Perez explained that after her initial one to two absences in August-October 2018, her symptoms improved and that it was not until "sometime in 2019" that her cervical pain "really started to get bad" (Doc. 73 at p.239, lines 17-19).  Perez further stated that after her cervical surgery in December 2019 is "when [she] really, really noticed [her] back [was] bothering [her] now that [she] did not have to focus on [her] neck" (Doc. 73 at p.240, lines 12-15).

Despite her injuries, Perez finished nursing school in November 2019, a little over a year after the accident (*Id*.) and in March 2020 accepted a new job as a RN at Blake Medical Center.  At trial, Perez verified that employment records reveal she signed a form on March 6, 2020 indicating she could perform the minimum requirements and essential functions of her new RN job, including frequent lifting and carrying; some crawling and climbing; frequent reaching above head and shoulders; frequent twisting at waist; lifting and carrying objects weighing up to 25 pounds (Defendant's Ex. 16, BLAKE-0011-0017, Doc. 73 at pp.217-220).

She testified: "That was my signature, yes. But I don't recall … reading this.  I just signed it because I was excited to get the job" (Doc. 73, p.219, lines 10-12.  220, 223).  Despite agreeing that she signed and dated the Blake form indicating "I have reviewed these job requirements and verify that I can perform the minimum requirements and essential functions of this position," when questioned further about whether she verified that she could fulfill the physical demands of her new job, Perez testified that "I can' say yes or no because I wasn't directly asked … to demonstrate I could.  So I don't know if I could or not, I can't answer." (Doc. 73, p.220, lines 2-4).  At the time of the trial, Perez was employed as an RN at Sarasota Memorial Hospital (Doc. 73 at p.217, line 17).

## CONCLUSIONS OF LAW

When a claimant brings a FTCA claim, the Court applies the law of the state where the alleged act or omission occurred.  28 U.S.C. § 1346(b)(1).  Because the accident at issue occurred in Florida, Florida law applies.  It is well-settled that drivers owe a "duty to use reasonable care on roadways to avoid accidents and injury to [themselves] or others." *Williams v. Davis*, 974 So. 2d 1052, 1063 (Fla. 2007).  As set forth in the findings of fact, the vehicle Handlon operated collided into the rear of the vehicle Perez operated.  Under Florida substantive law, the driver of a vehicle who causes his vehicle to rear-end another vehicle is presumed at fault for causing the collision.  *Rementer v. United States*, No. 8:14-cv-642-T-17MAP, 2017 WL 1095054, at *17 (M.D. Fla. March 21, 2017) (citing *Eppler v. Tarmac America, Inc.*, 752 So. 2d 592, 594 (Fla. 2000)).  If there is no evidence "produced from which a jury could conclude that the front driver in a rear-end collision was negligent and comparatively at fault in bringing about the collision," the driver of the rear vehicle is liable as a matter of law. *Green v. United States*, No. 6:11-cv-1774-Orl-18KRS, 2013 WL 6145530,

16

at *3 (M.D. Fla. 2013) (quoting *Birge v. Charron*, 107 So. 3d 350, 361 (Fla. 2012)). Notwithstanding the parties' disagreement regarding the details of the accident, the United States presented no evidence to rebut the presumption in this case.

However, "[a] finding of breach of a duty of care on the part of a defendant … does not establish a right to recovery by the plaintiff unless the plaintiff can also show causation and damages." *Hendrix v. United States,* No. 8:19-cv-1145-SCB-AAS, 2021 WL 1997426, at *6 (M.D. Fla. May 19, 2021) (citing *Giter v. United States*, 2010 WL 375929, at *6 (M.D. Fla. 2010)). In negligence actions, Florida courts follow the "more likely than not standard of causation" and require proof that "defendant's negligence 'probably caused' the plaintiff's injury." *Aycock v. R.J Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (citing *Cox v. St. Joseph's Hosp.*, 71 So. 3d 795, 799 (Fla. 2011) and *Gooding v. Univ. Hosp. Bldg, Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)). In *Gooding*, the Florida Supreme Court explained the burden of proof:

> On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

445 So. 2d at 1018 (quoting Prosser, Law of Torts § 41 (4th Ed. 1971)).

Furthermore, under Florida law, there is no recovery for non-economic damages arising from a motor vehicle accident unless the negligence caused a permanent injury within a reasonable degree of medical probability or significant and permanent scarring or disfigurement. Fla. Stat. §§ 627.737(2)(b) and (c) (2015); *Hunter v. United States*, No. 88-1031-CIV-Orl-18, 739 F.Supp. 569, 573-74 (M.D. Fla. 1990) (quoting *Eley v. Moris*, 478 So. 2d 1100

1103 (Fla. 3rd DCA 1985)) ("If the threshold requirement of permanent injury is not reached, a court cannot 'award general damages for pain, suffering or any of the other elements of damages set forth in [Fla. Stat] section 627.737(2)'").  Expert testimony is necessary in a negligence action to establish causation where the injuries are not readily observable.  *Ballard v. United States*, No. 3:15-cv-101-J-25MCR, 2017 WL 11630641, at *8 (M.D. Fla. Oct. 5, 2017); *Remerter*, 2017 WL , at 1095054, at *18 ("In the negligence context under Florida law, "lay testimony is legally insufficient to support a finding of causation where the medical condition involved is not readily observable.")  As noted in both *Ballard* and *Remerter*, a plaintiff's back pain and other soft tissue injuries are not "readily observable" medical conditions.  *Id*.

The parties presented competing opinions regarding the cause of Perez's lumbar and cervical complaints.  "As the fact-finder, the Court is 'free to determine the reliability and credibility of expert opinions and, if conflicting, to weigh them as the finder sees fit.'"  *Gonzalez v. United States*, No. 3:14-cv-419-J-34JBT, 2017 WL 1756476, at *8 (M.D. Fla. May 5, 2017) (quoting *Dep't of Ag. & Consumer Servs. v. Bogorff*, 35 So. 3d 84, 88 (Fla. 4th DCA 2010)).  The Court's decision to reject an expert testimony "must be founded on some reasonable basis in the evidence."  *Id.* (quoting *Boyles v. A & G Concrete Pools, Inc.*, 149 So. 3d 39, 48 (Fla. 4th DCA 2014)).  For example, such a basis for rejecting expert testimony can include:

> conflicting medical evidence, evidence that impeaches the credibility or basis for an expert's opinion; lack of candor of the plaintiff in disclosing prior accidents, prior medical treatment, and prior or subsequent similar injuries; conflicting lay testimony or evidence that disputes the injury claim; or the plaintiff's overall credibility relating to conflicting statements regarding the alleged injury.

*Id.*

Upon careful consideration of the evidence, the Court finds that Perez failed to prove that the United States' breach of duty, and resulting accident, caused her to suffer a permanent injury.  In reaching this conclusion, the Court finds the opinions of the United States' experts more credible than the opinions of Perez's experts.  As set forth more fully in the findings of fact above, Drs. Cronen and Kaye each reviewed Perez's radiological studies and opined that the lumbar and cervical studies showed no evidence of an acute injury.  Rather, both doctors opined that the findings revealed that Perez suffered from degenerative disc disease.  During his testimony, Dr Kaye presented radiographic images to the Court and convincingly identified the evidence of Perez's degenerative conditions, including disc osteophytes superimposed on a narrow spinal canal.

At trial and in his October 2, 2019 office note, Dr. Davis opined that "there is a reasonable degree of medical probability that [Perez] has sustained injuries and impairment as a result of the accident and given the patient's reported history, timing, and onset of symptoms specifically follow the above accident on 8/13/18" (Plaintiff's Ex. 5, p. 003).[4]  Dr. Davis testified that this statement was based on Perez's subjective complaints, the history he took, and the objective findings found on the MRI" (Doc. 72 at p.100, lines 13-16).  Dr. Davis, however, did not treat Perez until nearly 14 months after the accident (thirteen months before Dr. Davis's initial visit).  Upon her initial visit on October 2, 2019, Dr. Davis had trouble reconciling the symptoms Perez described with the cervical MRI taken one month after the accident.  Dr. Davis explained that he "didn't really feel what he saw on the [September 20, 2018] MRI would really cause the symptoms" (Doc. 72 at p.49, lines 17-18).  Even after

---

[4] While cast as a treating physician, Dr. Davis admitted that he formed this opinion in case Perez was involved in litigation.  (Doc. 72 at p.111, lines 11-14).

reviewing an updated MRI, Dr. Davis testified that Perez's symptomatology only "*kind of*
made sense" or made "*a bit more* sense" (Doc. 72 at p.49, lines 10 21-22) (emphasis added).
While Perez's life care planner, Dr. Steven Barna, opined that Perez's cervical and lumbar
injuries were a result of the August 13, 2018 accident, Dr. Barna agreed that his opinions
"depend upon the patient being honest and truthful" and upon "Dr. Davis providing accurate
information" (Doc. 72 at p.172, lines 24-25-p.173, line 1).

Perez's claimed injuries rest largely on her subjective complaints of pain.  Perez,
however, exaggerated both her symptoms and the details of the crash.  For instance, on Dr.
Davis's intake forms, Perez checked "vehicle totaled" box when asked to describe the August
13, 2018 accident (Defendant's Ex. 8, TBOSG-0024).  At trial, Perez testified that "in [her]
opinion" the car was totaled due to a cracked engine block (Doc. 73, p.189, lines 5-12) and
that as a result the car stopped working (Doc. 73 at p.225, lines 20-25).  Pictures of Perez's
vehicle, however, showed only minor bumper damage, consistent with the $1,420.00 estimate
from Jim Browne Collision Center (Defendant's Ex. 11 & 12).  Likewise, Perez testified that
she experienced neck pain right away, but the medical records reveal that Perez had: "**No
pain at the time of the incident**.  Soreness started the next day and has increased/ persisted,
**in low back only** . . ."  (Plaintiff's Ex. 1, p. 001) (emphasis added).  Similarly, when Perez
first visited the chiropractor eight days after the accident, she did not indicate neck pain on
the intake form (Plaintiff's Ex. 3, p. 002-003).  The reasons Perez provided at trial for her
failure to "check off" neck pain lacked credibility (Doc. 73 at p.233, lines 6-15).  She testified,
"I don't recall why, but a lot of my appointments were … early morning, so my symptoms
usually happen as the day goes on.  So either I didn't necessarily notice it that morning, or as
you're doing your forms … they kind of call you back.  So I didn't get to finish my forms.

You know, you feel kind of rushed when they call you back.  So I don't know the exact scenario why I didn't put it, but it could have been that day my pain was my back.  They both—I's like one thing hurts more than another at one time and then, you know, vice versa. (Doc. 73, p.233, lines 6-15).  Perez's testimony about whether she exercised or not; what her job duties were and whether she was required to lift patients or carry objects; and how she rated her pain also lacked candor.

Most noteworthy was Perez's testimony about why she stopped treating with Dr. Parekh in January 2019.  Perez testified that at her January 2019 appointment, she reported to Dr. Parekh that she experienced "less than a week" of relief after the cervical epidural injection given to her in December 2018 (Doc. 73 at p.227, line 3).  Dr. Parekh's office note, however, reflects that Perez "underwent cervical epidural steroid injection with moderate relief" and that reported "pain [was] not as severe as it was prior to the procedures [sic]" (Plaintiff's Ex. 4, p. 012-013).  Likewise, at trial, Dr. Parekh testified that at her January 12, 2019 appointment Perez reported that she "receive[d] relief [from the cervical epidural injection] and her pain was not as severe as it was prior to the injection" (Doc. 73 at p.144, lines 16-17).[5]  Dr. Parekh testified, "I don't think [I] even examined her neck that day because she was feeling fairly well" (Doc. 73 at p.144, lines 21-23) and that "if I recall correctly her neck pain did improve and our attention kind of focused to her lower back" (Doc. 73 at p.135, lines 17-18).  Perez did not return to Dr. Parekh until May 12, 2020.  At trial, however, Perez claimed that "we did telephone follow-ups but not in office …" (Doc. 73, p.228, lines 3-4).

---

[5] Parekh, who is board certified in both anesthesiology and chronic pain medicine, testified as a lay witness at trial.

Perez's claim appears to be false as there is no indication in the medical records that these telephone follow-up appointments actually occurred.

When Perez took the stand at trial, she recalled that in January 2019 she "wasn't able to function from pain" (Doc. 73 at p.228, lines 14-17).  Nonetheless, Perez did not see a medical doctor for pain until October 2019 (Doc. 73 at p.228, lines 18-20).  When asked why she did not return to Dr. Parekh, Perez testified that Dr. Parekh "was only offering injections and that wasn't really helping me" and that "undergoing an injection is very painful and it just provided minimal relief for what the muscle relaxer would do or the anti-inflammatory" (Doc. 73 at p.228, lines 8-10).  Accordingly, the Court's finds Perez's credibility to be lacking.

Still, although the Court is unconvinced that Perez suffered a permanent injury as a result of the accident, she did experience non-permanent symptoms requiring medical care.  As the United States expert, Dr. Cronen, conceded, Perez's "low back symptoms seem to be temporally, at least, related to the motor vehicle accident" (Doc. 73 at p.49, lines 20-21).  The same is true for the secondary complaint of cervical pain first noted by her chiropractor eight days after the accident.  Treatment for these non-permanent lumbar and cervical symptoms was reasonably necessary through April 2019, including Perez's initial evaluation by Dr. Wetherington, and her subsequent treatment by her chiropractor and Dr. Parekh during that period. On January 16, 2019, her treating chiropractor opined she had reached MMI and needed only twice monthly appointments to maintain her current status.  Thereafter, Perez continued chiropractic care for two months, then stopped treatment altogether.  Perez curtailed her treatment with Dr. Parekh at the same time.  Dr. Parekh testified that as of January 2019, Perez was "feeling fairly well" and that he had advised Perez to return "as needed" (Doc. 73 at p.144, lines 21-15).  Perez did not return to Dr. Parekh for nearly 16

months (Doc. 73 at p.146, line 5).  While Perez attributes the gap in care to her busy work and school schedule, the Court does not find her explanation credible in light of her alleged inability to function due to pain.  During this treatment hiatus, Perez visited primary care providers in June and August 2019 and did not complain of back/cervical pain nor show signs of either upon examination or ambulation. Meanwhile, Perez started a new full-time LPN job in April 2019; filed her SF-95 demand letter in June 2019 reflecting damages in the amount of $126,417.38; graduated from nursing school in November 2019; and resigned from her LPN job to take a "better job" as an RN in April 2020 (Defendant's Ex. 18, OPTUM-0001). Accordingly, the Court finds it more likely than not that Perez's non-permanent injuries resolved by no later than April 2019—when Perez discontinued all treatment for her alleged injuries for several months.

## II. Damages

In light of the foregoing, the Court concludes that Perez incurred the following medical expenses as a result of the non-permanent injuries to her cervical and lumbar spine.

| Provider | Date | Amount |
|---|---|---|
| **Florida Medical Clinic (Wetherington)** | | |
| | 8/16/18 | 216.00 |
| **Rose Radiology & Akumin Radiology** | | |
| | 8/22/18 | 477.68 |
| | 9/20/18 | 2,200.00 |
| **Universal Spine (Parekh)** | | |
| | 10/18/18 | 878.00 |
| | 11/10/18 | 3,047.36 |
| | 11/21/18 | 303.72 |
| | 12/15/18 | 4,039.20 |
| | 1/12/19 | 451.96 |
| | | |

| Provider | Date | Amount |
|---|---|---|
| **Synergy Health and Wellness (Abrahams)** | | |
| | 8/21/18 | 455.00 |
| | 8/24/18 | 280.00 |
| | 8/27/18 | 280.00 |
| | 8/29/18 | 280.00 |
| | 9/05/18 | 280.00 |
| | 9/10/18 | 280.00 |
| | 9/12/18 | 280.00 |
| | 9/14/18 | 280.00 |
| | 9/18/18 | 280.00 |
| | 9/24/18 | 425.00 |
| | 9/26/18 | 280.00 |
| | 9/28/18 | 280.00 |
| | 10/01/18 | 280.00 |
| | 10/03/18 | 280.00 |
| | 10/05/18 | 280.00 |
| | 10/09/18 | 280.00 |
| | 10/12/18 | 280.00 |
| | 10/17/18 | 280.00 |
| | 10/19/18 | 280.00 |
| | 10/22/18 | 280.00 |
| | 11/07/18 | 280.00 |
| | 12/12/18 | 425.00 |
| | 12/26/18 | 280.00 |
| | 1/16/19 | 425.00 |
| | 2/01/19 | 425.00 |
| | 2/15/19 | 280.00 |
| | 2/22/19 | 280.00 |
| | 3/01/19 | 280.00 |
| | 3/08/19 | 280.00 |
| | 3/11/19 | 280.00 |
| | 3/18/19 | 280.00 |
| | 4/30/19 | 280.00 |
| | | |
| **TOTAL** | | 21,328.92 |

Pursuant to Florida law, a plaintiff may recover non-economic damages, including past pain and suffering; past loss of capacity to enjoy life; future pain and suffering; and future loss of capacity to enjoy life, only by proving within a reasonable degree of medical probability that she suffered a permanent injury or that she suffered significant and permanent scarring or disfigurement. *Boccio v. United States*, No. 8:09-cv-475-T-24EAJ, 2010 WL 2734478, at n.26 (M.D. Fla. 2010) (citing *Eley v. Moris,* 478 So. 2d 1100, 1103 (Fla. 3rd DCA 1985)). "If the threshold requirement of permanent injury is not reached, a court cannot 'award general damages for pain, suffering or any of the other elements of damages set forth in section 627.737(2).'" *Hunter*, 739 F.Supp. at 574 (quoting *Elay*, 478 So. 2d at 1103). Because Perez has not established by the greater weight of the evidence that she suffered a permanent injury, she is not entitled to non-economic damages. Fla. Stat. § 627.737(2).

Accordingly, it is hereby

ORDERED:

1. The Clerk of Court is directed to enter judgment in favor of Plaintiff Ariane Perez in the amount of $21,328.92; and

2. The Clerk of Court is directed to close this case.

**ORDERED** in Tampa, Florida, on March 29, 2022.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE